**Franklin WHITE, Plaintiff,**

v.

**ALCON FILM FUND, LLC, et al., Defendants.**

Civil Action No. 1:13–cv–1163–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed Oct. 6, 2014.

Alan Stuckey Clarke, The Entertainment Law Group Alan S. Clark & Associates, LLC, Atlanta, GA, for Plaintiff.

Anthony D. Sbardellati, Gerald L. Sauer, Sauer & Wagner, LLP, Los Angeles, CA, Alexandra Jacqueline Chanin, Gary S. Freed, Thompson Hine LLP, Atlanta, GA, for Defendants.

### ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This copyright infringement case comes before the Court on the parties' cross-motions for summary judgment [65, 69].

## I. Background

Plaintiff Franklin White is the author of *First Round Lottery Pick* ("the book"), which follows the story of fictional character Langston Holiday. The book was first published in hardback in November 2005. A revised paperback version was published and registered with the United States Copyright Office in March 2010.[1] Langston is an All–American basketball talent, living in Ohio's dangerous and gritty housing projects. Recognizing that a basketball career is his opportunity to escape poverty, he decides to forgo college and enter the professional draft. But before realizing his dream, he must overcome "a wave of unthinkable drama and crime."

Erik White,[2] a non-party to this action, maintains that he came up with the story idea for *Lottery Ticket* ("the film") in the late 1990s. He later collaborated with screenwriter Abdul Williams, and the story became the basis for their 2006 treatment.[3] The screenplay was finalized, pre-production began in August 2009, and the film was released in 2010. The film centers on main character Kevin Carson, a recent high school graduate living in urban housing projects.[4] Kevin discovers on Saturday morning that he has the winning lottery ticket to a $370 million jackpot. But the lottery office is closed for the Fourth of July holiday weekend, so Kevin must survive the antics of his greedy neighbors until the office re-opens on Tuesday.

In November 2010, Franklin White viewed the film and formed the belief that Defendants had copied his book. In 2013, he brought this copyright infringement action against the film's production company and distributor. To adjudicate a copyright dispute of this kind, a court must undertake a detailed comparison of the works.

1. Copyright registration number TX0007156595.

2. The Court will refer to Plaintiff Franklin White as "White" or "Plaintiff White" and non-party author and director Erik White by his full name, in an effort to avoid confusion between the two authors.

3. "Treatment" refers to an initial draft of a screenplay, generally much longer and more detailed than an outline.

4. The film was produced in Atlanta, Georgia and the opening scenes feature a sign bearing the name Fillmore housing projects, but the precise location is never identified.

*Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 456 (11th Cir.1994). The Court has reviewed both works and begins by briefly summarizing them below.

## A. First Round Lottery Pick (the book)

The book is an urban crime drama about Langston Holiday, a young African–American boy from Poindexter Village (a fictional public housing project in Ohio). Langston is being raised by a single mother in a community rife with poverty, violence and drugs—but Langston finds relief in basketball. The book begins with Langston, a high school senior, walking past the courts he grew up playing on, remarking that "not even all the empty beer cans, used condoms, or broken pint bottles" could change his good mood about his future as a professional basketball player. He meets up with his best friend, Jalen, and his longtime girlfriend Tori, whom he describes as "the finest female at East High School." Langston tells Jalen that he has decided to enter the professional draft, but that he intends to maintain his eligibility so that he can play at Ohio State University as a back-up.

Meanwhile, Toy, a much older neighborhood thug and former standout basketball player, is determined to be Langston's professional agent. Langston initially refuses, however, not only because he wants nothing to do with Toy, but because signing with an agent would destroy his college eligibility. Despite being in a long-term relationship with Tori, Langston also carries on a sexual relationship with Katrina, a young woman in his high school class. The book's initial chapters introduce readers to Langston's casual sexual relationship with Katrina, his incredible resentment toward his absent father, who is in a homosexual relationship with another man, and Langston's decision to ask Tori to marry him.

The book takes its first dramatic turn when Tori is riding in a car that is attacked by gunfire and she is kidnapped. Langston is left searching for Tori and consoling her mother as she cries in his arms. Days later, Toy reveals that he knows where Tori is and will disclose her location only if Langston signs him as his agent. Langston agrees and discovers that Tori has been beaten and hidden in an abandoned car. Tori spends days in the hospital recovering. Langston wants desperately to be at her bedside, but she initially refuses to be around any men, including him. Langston cannot understand Tori's her fear and refusal until she reveals that she was brutally gang-raped by multiple men.

Meanwhile, Toy has arranged a $17 million shoe endorsement deal for Langston with fictional sports apparel company New Funk Apparel. Langston shares his newfound wealth by buying his mother a new home and fronting Jalen money. Jalen uses that money to buy a Cadillac Escalade, start a record label, try his hand at adult films, and invest in a "package" of high-quality drugs being sold in the projects by a shady and dangerous figure, Murder One. Langston tries to focus on training for basketball and getting ready for the draft, but his relationship with Tori is further complicated when she realizes that she is pregnant as a result of the attack. The two discuss the possibility of her having an abortion and her fears that everything that has happened to her has changed their future together. Despite vowing to stay with Tori and to marry her, Langston continues his sexual exploits with Katrina. When Tori finds out, she is crushed and breaks up with him.

Eventually, draft day arrives and Langston travels to New York with his mother,

Jalen and Toy. Langston appears proud that he can afford to take his mother to New York to shop in fancy stores, but he spends much of his time breaking up altercations between Jalen and Toy. Soon after their return to Ohio, Langston's mother wakes him to the tragic news that Jalen is at the hospital, in the intensive care unit. He has been beaten severely and has had his left leg and right arm cut off. Jalen reveals to Langston that Toy was responsible for mutilating him and for the gang-rape of Tori. Before Langston is able to confront Toy, Jalen dies. Like the somber mourning and tearful episodes described following Tori's kidnapping, Langston is again forced to deal with incredible loss. The book describes intense grieving by his family, Langston's attempts to console Jalen's mother, and Jalen's funeral.

Jalen's death brings Langston and Tori back together, and they decide to raise her child and name him after Jalen. Langston and Tori also complete Jalen's project to build and dedicate a new basketball court to the community, as an effort to keep children off the streets and away from violence. In the final scenes of the book, Langston arranges a meeting with Toy, planning to shoot him. But just before Langston can pull the trigger, Katrina (Langston's earlier love interest) emerges from the shadows, bloody and swollen, to reveal that she has been raped as well. She shoots Toy at point blank range and the book ends as they stare at Toy's lifeless body.

### B. Lottery Ticket (the film)

The film is a light-hearted comedy about Kevin Carson, a recent high school graduate living in the non-descript but upbeat Fillmore housing project. The film opens with news coverage and amusing local television interviews with people all over town telling the morning newscaster what they would do if they won the upcoming mega lottery drawing. School has recently let out for summer and Kevin is getting ready for work. Kevin, his best friend Benny, and their friend Stacie walk through the housing project, encountering the film's principal characters: Kevin's gregarious and satirically religious Grandma; Nikki, a sexy and unattainable girl who pays no attention to Kevin; Lorenzo, the neighborhood bully who has recently been released from jail; Semaj, the community gossip; and Mr. Washington, the odd recluse who never leaves his home, but seems to have a special connection with Kevin.

While Kevin is at work at Foot Locker, Lorenzo shows up with his friends and attempts to steal several pairs of sneakers. Kevin decides to tell the truth about Lorenzo but is still fired by his harebrained boss. Upset that he has just lost his job, Kevin meets Stacie in the food court for lunch. He opens a fortune cookie that says: "Many a false step is made by standing still." On his walk home from work, Kevin stops at the crowded neighborhood liquor store run by an entertaining clerk. Earlier that day he had promised Grandma that he would play her lucky numbers, but at the last minute he buys a second lottery ticket for himself, using the numbers from the back of the fortune cookie.

Kevin wakes up the next morning to learn that he has won the jackpot and he and Grandma enjoy a riotous, dancing celebration in their living room. He and Benny head downtown to the lottery office, only to find out the office is closed until Tuesday morning due to the long holiday weekend. By the time Kevin returns home, Grandma and Semaj have broadcast the good news, and the whole neighborhood gathers around Kevin, hoping to profit from his new riches.

Realizing Kevin will soon be a millionaire, Nikki suddenly takes an interest in

him. His friends insist that he impress her by taking her to a fancy restaurant. But having not yet cashed in his winning ticket, Kevin gets a $100,000 loan from local mobster Sweet Tee, and goes on a shopping spree, goes out on the town, and takes Nikki to the fanciest restaurant in town. Kevin ends up at Nikki's house that evening, where she tries to seduce him and admits that she is interested in him solely for his newfound money. On his way home, Kevin is invited into the house of the elderly neighborhood recluse, Mr. Washington, who mentors Kevin.

The next day at Grandma's church, the pastor (a satirical, money-grubbing church leader) makes a thinly veiled plea for Kevin's lottery money, which is interrupted by Lorenzo chasing Kevin down the aisles and around the city, trying to steal the lottery ticket. Kevin begins to feel exploited by everyone in the neighborhood and even accuses his best friend Benny of trying to take the ticket. Kevin then goes to Stacie's house, where for the first time he admits to her that he really likes her and their relationship turns romantic. As Kevin leaves Stacie's house, Lorenzo knocks him out and steals the lottery ticket.

Kevin and Benny quickly reconcile, and they come up with a plan to get the lottery ticket back. Ultimately, at the neighborhood Fourth of July barbeque, Lorenzo, Kevin and Sweet Tee come to blows over the ticket—the demure Kevin trying to stand up to Lorenzo; Sweet Tee trying to protect his "investment" in Kevin's new money. Both are beaten badly by the far stronger Lorenzo. But ultimately, Mr. Washington, a former boxer, comes to Kevin's rescue and with one uppercut knocks Lorenzo out. The lottery ticket is returned to Kevin and he presumably cashes it in the next morning.

The film then fast-forwards months later, revealing that Kevin has founded the "Carson Foundation" which funds local businesses, grants scholarships and focuses on positive changes in the community. Kevin donates a park to the community, names Mr. Washington the new head of security and then flies off in a helicopter with Benny and Stacie.[5]

## C. Procedural Background

Plaintiff White's copyright infringement claim is based principally on the paperback version of his book. White contends that in February 2009, he sent a pre-publication copy of the book to Matt Alvarez, president of Defendant Cube Vision, Inc.[6] Having heard that Cube Vision was potentially producing a new television series that would feature NBA star LeBron James, White sent the unsolicited book as a writing sample so that he might be considered for a writing position for the series.[7]

---

5. This is an amusing reference to one of the movie's earliest scenes, in which characters jokingly dream about what they would do if they won the lottery, teasing one character about the practicality of buying a helicopter.

6. Cube Vision is the film production company of O'Shea Jackson (professional known as "Ice Cube"). In August 2009, Cube Vision agreed to produce the film with Alcon Entertainment, LLC and to involve Ice Cube to play the role of "Mr. Washington."

7. White also asserts that he bases his claim on the hardback copy of the book, which was released nationally in November 2005. He contends in reply to Defendants' opposition to his motion for summary judgment that despite not registering it with the United States Copyright Office, he placed a copyright notice in the book. The Court cannot confirm this, as White's reply incorrectly states that the 2005 *hardback* book was submitted to the Court. The manual filing [66] very clearly contained only a copy of the 2010 *paperback* book. Nevertheless, the Court accepts that the 2005 and 2010 versions of the book differ in only the most minor respects: in the 2005 version Langston enters the NBA draft,

In the meantime, in the late 1990s, Erik White contends that he conceived of the idea for the film. He has testified that he developed the general idea while growing up in the projects in Brooklyn and watching sweepstakes winners on television—imagining what winnings would be like for someone in the projects and later reading a newspaper article about a man who had to wait a few days to cash in a winning ticket. Years later, in 2004 and 2005, Erik White collaborated with screenwriter Abdul Williams, who drafted the screenplay. The film project was put on hold due to various studio and ownership changes, but in August 2009, Defendants began pre-production for the film. In 2010, the film was distributed nationwide by Warner Brothers Pictures and its parent company, Time Warner.

On April 4, 2011, White's previous counsel sent a demand letter to Warner Brothers Pictures, Alcon Entertainment and Cube Vision, informing them that the film constituted infringement of the book. White received no response. On April 9, 2013, he filed this action against Defendants.

On April 16, 2014, both parties moved for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir.1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir.1995) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

▮ While some courts have found summary judgment inappropriate in copy-

---

whereas in 2010 high school graduates were prohibited from immediately entering the

NBA draft, so Langston is depicted entering a European draft.

right infringement cases because of their ultimate subjectivity,[8] the Court may grant summary judgment where "the similarity between the works concerns only non-copyrightable elements" or where "no reasonable jury upon proper instruction would find that the two works are substantially similar." *Beal*, 20 F.3d at 459 (citing *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir.1983)). Further, by filing cross-motions, the parties appear to concede that the issue of substantial similarity is ripe for determination by the Court. *Shook v. United States*, 713 F.2d 662 (11th Cir.1983) ("Cross motions for summary judgment may be probative of the nonexistence of a factual dispute. Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment.") (in-ternal citation omitted). The parties do not dispute the material facts of this case, and the content of each of the two works speaks for itself. The only disagreement is whether the similarities concern non-copyrightable elements and whether a reasonable jury could find them to be substantially similar.

## A. Analysis

■ "To establish copyright infringement, two elements must be proven: ownership of a valid copyright, and copying of constituent elements of the work that are original." *Beal*, 20 F.3d at 459 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). Defendants concede that White holds a valid copyright in *First Round Lottery Pick*; therefore, only the alleged copying is at issue.[9]

---

**8.** *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir.1999) (citing *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.1980) (summary judgment historically withheld in copyright cases because substantial similarity is customarily extremely close question of fact). However, *Hoehling* affirmed summary judgment, citing a series of cases in the Second Circuit granting summary judgment when the alleged similarity relates to non-copyrightable elements. Courts in this and other circuits are increasingly willing to resolve such cases on dispositive motions well in advance of trial. Even in cases where two works may appear at first blush to share common themes, characters or plots, courts will go beyond surface level similarities to determine if the more stringent requirements of access and substantial similarity have been met. "Substantial similarity can be decided as a matter of law." *Lil' Joe Wein Music, Inc. v. Jackson*, 245 Fed.Appx. 873, 877 (11th Cir. 2007); *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)). Indeed, the Ninth Circuit "ha[s] frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir.1990).

**9.** In an effort to dispute White's statement of material facts [76–10], p. 10 Defendants now argue under 17 U.S.C. § 410, that only "the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright ..." and that White's copyright registration page printout [69–6] is not sufficient to serve as prima facie evidence of the validity of the copyright. While a copy of the original registration would be preferable, courts have taken judicial notice of true and correct copies of the Copyright Office's online record of registration, available at http://cocatalog.loc.gov. *See e.g., Obodai v. YouTube LLC*, 840 F.Supp.2d 714 (S.D.N.Y.2011); *Slate v. Am. Broad. Cos.*, 941 F.Supp.2d 27 (D.D.C.2013) (referencing copyright office's online public catalog as evidence of plaintiff's multiple copyrights).

More importantly, however, Defendants do not honestly challenge the validity of White's 2010 copyright and have conceded in prior filings that the copyright is valid and enforceable. [21], p. 6 n. 4 ("The Defendants do not contest that Plaintiff is the author of the book "First Round Lottery Pick" (the "Book") or that his copyright in the Book is valid.") and [65], p. 3 n. 6 ("While Defendants dispute

■ Copying can be proven by direct or indirect evidence. And while White alleges in his motion that "there is both direct and circumstantial evidence of copying present in this case," he presents no evidence of direct copying. White's claim therefore rests entirely on indirect evidence of copying.

■ This circuit applies a two-part test for indirect proof of copying. First, the plaintiff must show that the defendant had access to the plaintiff's work. Second, the plaintiff must show that the defendant's work is substantially similar to the plaintiff's protected work. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982) (citations omitted).

■ In very rare cases, a plaintiff may still prevail without showing access by demonstrating that the works are so strikingly similar as to preclude the possibility of independent creation. *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1253–54 (11th Cir.2007) (similarities are "so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.") (citations omitted). White does not claim, nor does the Court find, that the works meet the exacting standard of striking similarity.[10]

### 1. Access to the Work

■ Access is generally defined as "a reasonable opportunity to view" the copyrighted work. *Herzog*, 193 F.3d at 1249. "Reasonable opportunity does not encompass any bare possibility in the sense that anything is possible ... [a]ccess may not be inferred through mere speculation or conjecture." *Id.* at 1250 (citing *Ferguson v. Nat'l Broad. Cos.*, 584 F.2d 111, 113 (5th Cir.1978) and 4 NIMMER ON COPYRIGHT, § 13.02[A] (2009)).

■ White presents two disjointed theories of access. He argues initially that Defendants had access to his work in February 2009, when he sent a copy of the soon-to-be copyrighted paperback version of the book to one defendant, Cube Vision. This would pre-date production of the film by just a few months, though White admits that he never received any response from Cube Vision to his unsolicited submission.[11] But White then concedes that Erik White and Abdul Williams, the film's director and screenplay writer, conceived of the idea of the story as far back as 1996 or 1997, had drafted a treatment of the film by 2006 and that they had absolutely no affiliation with Cube Vision while developing the screenplay. Erik White and Abdul Williams have testified that they had never heard of Franklin White, had never read his book and that they collaborated to develop a treatment and then screenplay years before publication of White's copyrighted book. In addition, Defendants have produced a 110–page, near-final draft of the screenplay dated July 20, 2008 [65–9], from which it is plainly obvious that the

---

ever having seen, read or heard of the book ... Defendants have elected not to move for summary judgment on the lack of access ... validity of Plaintiff's copyright, or independent creation ...").

**10.** White does not argue "striking similarity" in his own motion for summary judgment, nor in opposition to Defendants' motion. In his reply to Defendants' opposition [87], he introduces the striking similarity standard for

the first time, stating in conclusory fashion that "the works are not only substantially similar, they are strikingly similar." But he produces no additional evidence or explanation and simply recycles his arguments supporting substantial similarity.

**11.** Cube Vision representatives Matt Alvarez and David Hebenstreit have testified that they have no recollection of ever receiving White's paperback book.

story was complete nearly a year before White alleges he sent his book to the future production company.

Realizing that his theory of access based on his unsolicited submission of the book in 2009 is unavailing, White changes tack. He contends that as a nationally recognized professional author whose works have been published, distributed and sold throughout the United States, his works are widely known.[12] White appears to rely on the widespread, public dissemination of the hardback version of the book in arguing that all of the defendants (and the non-party writers) had access as early as 2005.

 "Public dissemination" sufficient to establish access requires a high degree of success. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir.2003) (plaintiff's video, which "only sold approximately 17,000 copies between 1986 and 1999," could not be considered "widely disseminated."). White has provided no evidence of the breadth of dissemination of the 2005 hardcover book and offers no sales records for the hardback version.[13] Instead, he has produced statements for four periods between 2010 and 2012, reflecting 2,661 units sold. Even generously presuming that White's hardback book

sold nearly 3,000 copies a year, the book would have generated no more than 15,000 sales over the five-year period after its initial release. Circulation and sales of this scale simply do not allow the Court to presume access.

White's conjectural assertions about Cube Vision's access in 2009 and his inability to prove widespread public access to the book during the relevant time period is insufficient to raise a triable issue of access.[14]

But even if the evidence of access were sufficient, White would still have to present evidence allowing reasonable viewers to conclude that the two works are substantially similar. White fails to meet this burden as well.

### 2. Substantial Similarity

 To determine substantial similarity, the Court asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 (11th Cir.2008) (citation omitted).

 The Court recognizes that there are similarities between the works, particularly with regard to their general

---

**12.** The 2005 hardback version of the book was published in November 2005 by Blue/Black Press but was never registered with the United States Copyright Office.

**13.** White explains that during his career he has written twelve novels that have appeared in thirty-four editions, including hardback, paperback, e-books and audio books. His books have been sold at Wal–Mart, Barnes & Noble, Borders, Amazon, Books–A–Million, Kroger, Walgreens and Sam's Club. White's list of accomplishments, speaking engagements, magazine features and book tours, however, never identifies precisely where, in what quantities or in what regions *First Round Lottery Pick* was actually featured and sold. Out of the 204 libraries allegedly carry-

ing his books, he has stated that only four are in California [87–2], where Defendants reside and White admits to never having traveled for book tours, readings or signings.

**14.** White cites to testimony in which Cube Vision representatives and screenplay writer Williams explain that they often read magazine articles, watched movies and television shows, read books and were immersed in research about urban and African–American comedies. But researching and drawing inspiration from a genre of work is not significant and probative evidence that Defendants had access to White's particular book. Defendants have testified under oath that they were not familiar with Franklin White's work and that they have never read his book.

plot lines and themes. White argues that these similarities raise a triable issue, but he misunderstands the nature of the protection afforded by copyright law. Certain forms of literary expression are not protected; chief among those unprotected elements are general plots and scenes common to particular genres. *Berkic v. Crichton,* 761 F.2d 1289, 1293 (9th Cir. 1985). When literary or cinematographic elements are merely "stock" themes or "*scènes à faire,*"[15] they are unprotected. A deeper inquiry into protectable expressions of the writers reveals that the two works are in fact extraordinarily different.

■ To evaluate claims of substantial similarity, courts in the Eleventh Circuit independently examine various aspects of the works in questions, including plot, mood, characterization, pace, setting, sequence of events, dialogue and theme. *Beal,* 20 F.3d at 460. The Court undertakes this exhaustive analysis below.

### Plot

■ The plots of the book and the film differ significantly. The book is about a young man living in a housing project who realizes a lucrative basketball career is his ticket out and is poised to seize the opportunity, only to have his life nearly fall apart after his fiancée is kidnapped and gang-raped, he is blackmailed into signing with a professional agent, and his best friend is mutilated and murdered.[16] The film, on the other hand, is about a young man who wins the $370 million lottery jackpot, but must first survive a three-day holiday weekend amongst his opportunistic neighbors.

The brutal gang-rape, drug deals, physical abuse, sexual exploitation of women, and violent death of the protagonist's best friend and agent are aptly described on the book's own cover as "a wave of unthinkable drama and crime." In contrast, the film portrays no drugs, no physical abuse, no rape or murder, and the film's violent scenes are by and large fist-fights and brawls involving no gunshots and no death.

White argues that the plot-lines are "nearly identical" and then relegates to a footnote the most glaring differences between the two.

> In order to keep the Film an urban comedy, [the film] did not include por-

---

15. "*Scènes à faire* are those elements of a work that necessarily result from the choice of a setting or situation, or sequences of events which necessarily follow from a common theme." *Arden v. Columbia Pictures Indus., Inc.,* 908 F.Supp. 1248, 1259 (1995) (citations omitted); *see also Hoehling,* 618 F.2d at 979 (*scènes à faire* are those "incidents, characters· or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic.").

16. White chooses to describe the book's plot as follows: a young male protagonist lives with a single mother in a tough urban setting. He receives a windfall of money for his basketball prospects, lands a lucrative endorsement deal and has a best friend who he keeps close at his side and promises to make his business manager. He is approached by women, given his newfound celebrity, but ultimately chooses the "good girl" that he has known since high school. Finally, he realizes his sports-related dream, learns responsibility to his community and gives back through a charitable donation.

White's plot description bears more striking similarity to the life of LeBron James than it does to Defendants' film. James was born and raised by his single mother in the seedier parts of Akron, Ohio, was a basketball phenom mentored by a local youth sports coach, who entered the NBA draft directly out of high school, has earned more than $50 million, married his high school sweetheart Savannah Brinson, enjoys numerous endorsement contracts, is famous for choosing childhood friends as agents and marketing directors, and is an active philanthropist in Ohio.

tions of the Book's plot containing adult or traumatic themes ([Tori] being kidnapped, gang raped, impregnated and ·having her friend shot; [Katrina] working as a stripper and killing the antagonist; [Jalen]'s dismemberment and death; and [Langston's] gay father and bad relationship with him.

■ at 17 n. 3. Far from being minor episodes or sub-plots, these serious and adult events feature most prominently in the book and appear nowhere in the film. Indeed, the entire "agent" relationship between Langston and the antagonist Toy is based upon the kidnapping and rape of his fiancée Tori. The sudden and traumatic event takes place over multiple chapters in the book and is the catalyst for Langston's contract with Toy, Tori's later pregnancy, the discussion of abortion and the consequences of Langston's later infidelity. Reference to the attack and rape appear more than fifteen times in a book of just 164 pages.

### Mood

Another dissimilarity between the Book and the film is their strikingly different moods. The book is dark and dramatic, and features such heavy topics as poverty, violence, drugs, infidelity, teenage pregnancy, homophobia, rape, mutilation and murder.

The film, on the other hand, is a light "feel-good" comedy. It avoids topics that could possibly be construed as "heavy" or "serious." The subtext of poverty typically associated with life in a housing project is dealt with on the most superficial level, and is barely felt throughout the film. Kevin has an upbeat and likeable disposition, and his interactions with Benny, the store clerk, Grandma and Semaj (his very name a joke about reversing "James") are littered with jokes and comedy. Even the antagonists, Lorenzo and Sweet Tee, are rarely frightening. When asked to describe the mood for the two works, White himself admits, "[m]y book was a drama" but that the film "was a comedy," "[an] upbeat comedy . . . laughing, lots of jokes, quick movements."

White argues that Defendants "ignore the comedy of the [b]ook," and yet does not cite to a single humorous episode or exchange. Indeed the book is devoid of comedy, and with the exception of some light banter between characters at the beginning, the Court's reading detected no explicit or implicit joking, irony or comedy.

### Characters

The protagonists of the two works do share broad similarities: they are young African–American males living in public housing projects with a single female parent figure. Beyond this, they vary greatly.

Langston has yet to graduate from high school, and as a stand-out basketball player he is grappling with the decision to pursue a professional basketball career rather than go to college. He reflects on the hard and dangerous corners in the hood, where he himself tried his hand dealing drugs in eighth grade. He recognizes the dangers of getting caught up in drugs, violence and other negative influences, but he also demonstrates a hardened familiarity with the more troubling sides of the projects, dealing drugs, drinking with his best friend and carrying a gun. Langston's sexual episodes involve scandalous and hurried encounters with Katrina when they sleep together first while skipping school, then in a car in the parking lot, and finally at a strip club. He is often reflective, contemptuous of authority and visibly carries the weight of his years in rough circumstances.

Kevin, on the other hand, is naïve, gentle and inexperienced. He does not use drugs or alcohol and is by all accounts a

cheerful, hard worker without any athletic or professional prospects. He is the only one in the community who takes time to be kind to Mr. Washington, the elderly recluse. He has one intimate encounter with Nikki, in which she seduces him and attempts to sleep with him because of his lottery winnings. Frustrated that he wants to use protection, Nikki refuses to sleep with him. Kevin is otherwise portrayed as comically awkward around women. In high school he dreamed of attending design school, but he lives with the reality that he and Grandma could never afford college. Kevin is humble, gentle and innocent. Langston, on the other hand, is perceptibly more hardened, sexually exploitative, tough and experienced.

White argues that the film's supporting cast is "identical" to the book. He contends that the "Best Friend," "Good Girl," "Bad Girl," "Mother Figure," "Villain" and "Sage Ex–Athlete" are nearly identical. And yet in describing them in such generic and simplistic fashion, he reveals the superficial nature of the otherwise clichéd similarities.

Jalen and Benny, the "best-friend" characters, are extraordinarily different from one another. Jalen is brash and a liability to Langston. He drives an Impala, drinks regularly and smokes marijuana. He brazenly involves himself in a major drug deal to distribute a "package" with Murder One, a notorious neighborhood dealer. With his newfound money from Langston, he buys a new Escalade, tries to start a record label, and makes pornographic films. These qualities are absent in Benny, who serves almost exclusively as Kevin's comic sidekick. Benny's only purpose seems to be to amuse—he is not impatient, brash or foolhardy like Jalen. He avoids the dangers of drugs, violence and alcohol, and his hysterical, light-hearted disposition bears little resemblance to Jalen's.

In the book, Langston is involved with a long-term girlfriend, Tori. She is devoted to Langston and in one scene engages in a public fight with Katrina over him. She struggles with the physical and psychological trauma of her brutal assault and initially refuses to be around men, including Langston. Realizing that she is pregnant, she broaches the intense and painful subjects of rape, abortion, and fatherhood with Langston. Tori is profoundly serious and dependent on their relationship, and she ultimately decides to follow Langston abroad as he launches his professional career.

Stacie, in stark contrast, is merely a close friend of Kevin's. Not until the end of the film does their relationship turn romantic, and even then their interactions are tender and light-hearted. Stacie is youthful and playful with Kevin, even telling him she's not interested in being with him when he first mentions that he is attracted to her. Unlike Tori, her virginity is never discussed, she experiences no trauma, and is college-bound and independent.

The characterization of antagonists, Toy and Lorenzo, also differs substantially. Toy is conniving and extremely dangerous. He orchestrates a kidnapping and gang-rape of Tori, using her as bait to blackmail Langston into signing a multi-year contract with him. He takes Langston to strip clubs, is portrayed physically and verbally abusing women, and then brutally mutilates and kills Langston's best friend Jalen. Lorenzo, on the other hand, is a comedic ex-con and neighborhood bully. Lorenzo first bullies Kevin and attempts to steal shoes from Foot Locker, trying to intimidate Kevin into covering for him. But instead of capitulating, Kevin snitches on him. Later, Lorenzo steals the winning lottery ticket from Kevin, setting up a public fight between the two over the tick-

et. All of the violent scenes in the film do feature Lorenzo. But he is a meathead with larger-than-life muscles who is portrayed fighting and beating up a number of people—never does he shoot, kill or maim anyone.

Not content to argue that Toy is recreated in Lorenzo, the neighborhood ex-con, White also asserts that Toy is "copied" in two other distinct and dissimilar characters: the film's reclusive, elderly mentor-figure (Mr. Washington) and the wealthy local mobster (Sweet Tee) who advances Kevin money while he waits to cash in the lottery ticket. Yet these characters play very different roles in the movie and are incomparable to Toy. Mr. Washington is, if anything, a father-figure to Kevin, challenging Kevin to stand up for himself, encouraging him· to give back to the community and ultimately coming to his aid when Lorenzo attempts to beat him up for the winning ticket. Sweet Tee is a mobster interested in getting his hands on a portion of Kevin's money, but unlike Toy, he does not blackmail Kevin into signing any sort of contract, he is not portrayed at strip clubs or being abusive toward women, he does not beat, mutilate or rape anyone, and he in fact stands up to Lorenzo on Kevin's behalf.

Finally, other than filling the stereotypical role of a sexy, promiscuous woman, Katrina and Nikki are markedly different characters. Katrina and Langston are involved in a long-term physical relationship, sleeping with each other frequently and carrying on a relationship "on the side" while Langston dates Tori. Nikki, on the other hand, has hardly heard of Kevin and maintains no pretense of being interested in him. She openly admits that she has no other way "out" of the projects if not with a wealthy man, and the film hints at satire regarding her affairs with LeBron, Bill Cosby and others. When the film ends, Nikki is an after-thought. When the book ends, Katrina appears in the night with Langston and violently shoots Toy in the head, spitting on him as he lies on the ground.

### Pace

The film is premised entirely on the passing of a single three-day holiday weekend. In contrast, while it is difficult to gauge the precise time span of the book, the story covers the end of Langston's senior year in high school, his basketball training, high school graduation, the purchase of a new home, the draft in New York, and his ultimate preparation to move abroad to France. Admittedly, both works involve quick scenes, short chapters and a fast pace. But a reader of the book follows the characters over the course of at least several months, while a film viewer is acutely aware that Kevin must simply "make it through the long weekend" in order to cash in his lottery ticket on Tuesday morning. *See Beal,* 20 F.3d at 463 (holding that where the plaintiff's work spanned nine months and the defendant's work spanned forty days, the two works were not substantially similar enough to weigh in plaintiff's favor).

### Setting

Both the book and the film are principally set in housing projects. That broad similarity is certainly not original to Plaintiff, or subject to copyright protection. *See e.g., Jackson v. Booker,* 465 Fed.Appx. 163, 164 (3d Cir.2012) ("[Plaintiff's work] tells a story about five teenagers from a hardlife big town housing project.").[17]

---

**17.** Numerous books, television series and films have been set in the projects, namely: *The Wire* (HBO series set principally in Baltimore's housing projects); *Tragedy: The Story of Queensbridge* (story of New York public housing); *Clockers* (Spike Lee film about

Moreover, the two housing projects are entirely dissimilar. In the book, Poindexter Village is depicted as a crime-ridden, gritty, depressing and violent place. Characters "kick crack pipe[s] out of the way," watch drug deals go down on the street, observe used condoms and broken pints of whiskey littered on the central court, see cars get "shot up" and women slapped in the face. The Fillmore Housing project in the film, on the other hand, has a light, colorful and neighborly feel. There is no reference to rampant drug and alcohol use and no visible portrayal of abject poverty.

White further contends that a "basketball court" is a focus of both works. This is simply not the case. A basketball court appears in an early scene in the film, when Kevin, Benny and Lorenzo have a discussion about new Nike shoes from Foot Locker while Lorenzo is sitting on the edge of the court in the middle of the housing project. Over an hour later, at the conclusion of the film, Kevin donates a new recreation center to the community. The court is not otherwise mentioned, and no one is highlighted playing, practicing or discussing basketball. And in any event, the commonplace portrayal of a basketball court is no less than a *scène à faire* in a story about a young man in public housing and is not copyrightable expression.[18]

In addition to the housing projects, the film includes significant scenes at a mall, at Grandma's church, downtown and at the local sundries store. The book's depar-tures from the housing project, on the other hand, are to the gym where Langston practices basketball, various characters' homes, New York City, the strip club and the hospital.

■■■ In addition to the factors discussed above at length, the *Beal* court expressed openness to other relevant factors, including theme, dialogue, and sequence of events. The Court therefore notes that none of the dialogue from the book appears in the film. Despite this, White attempts to draw similarities in the use of colloquial and slang terms like "gees" meaning "thousands of dollars," and "chill," meaning "relax." However, "[o]rdinary phrases are not entitled to copyright protection." *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir.1989) (citing *Alberto–Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir.1972)). The use of commonplace slang terms does not constitute protectable expression.[19] Likewise, any similarities in the sequence of events are a consequence of both works depicting predictable themes of the pitfalls of large financial windfalls, urban life, and romance.

### Expert Report and Points of Correspondence

■■■ In an attempt to draw out detailed points of similarity, White engaged expert Kathryn Arnold to create a chart of forty-four "points of correspondence" between

Brooklyn drug dealers); *Boss* (television series based on Chicago's infamous Cabrini–Green projects); *Good Times* (sitcom set in Chicago's poor, urban housing projects); *Freedomland* (novel set in the fictional Armstrong Housing Projects).

18. *See e.g., Beal*, 20 F.3d at 463 ("[T]he idea of a mosque-style palace with minarets is a *scène à faire* in a story about Arabian or African royalty. The fact that both palaces are lavish and contain private quarters and baths also is not copyrightable expression.")

19. Under White's broad theory of infringement, Will Smith, star of ABC's hit *The Fresh Prince of Bel-air*, may have a colorable claim against White for infringement of the show's theme song, which features the young, street-smart Will on the playground, "shootin' some b-ball outside the school," "chillin' out, relaxin' all cool."

the two works.[20] [69–13]. The Court begins by noting that the test of substantial similarity is based upon the "average lay observer" and that the testimony of experts therefore plays a minor role in the determination. *Original Appalachian Artworks,* 684 F.2d at 829. (citations omitted); *Shine v. Childs,* 382 F.Supp.2d 602, 614 (S.D.N.Y.2005) ("[S]ubstantial similarity should be determined not with the help of or solely by experts in the relevant field, but from the perspective of the ordinary observer."); *Gable v. Nat'l Broad. Co.,* 727 F.Supp.2d 815 (C.D.Cal.2010) (expert testimony is far less important where no specialized knowledge is required to evaluate the components of the copyrighted work, for example where pitch, melody, chords or structure might are evaluated in music or in cases about computer software programs). Defendants make no objection to Arnold's qualifications or the admissibility of her testimony, and the Court has reviewed her report.

Arnold's comparison list is overwhelmingly comprised of generalized ideas, themes, and *scène à faire.* When the list is examined in detail, claimed similarities either fail to materialize altogether or they pertain to non-protectable expressions. In the interest of judicial economy, the Court addresses below the most representative samples of the forty-four purported "points of correspondence" outlined by the expert.

- Both works open with the protagonist living alone with a mother figure in a housing project

No lay observer could possibly find this "point of comparison" to be anything more than a commonplace scene, reflecting the harsh realities of urban life. White can no more argue that he has a protectable interest in this scene than he can claim to own every story written about the more than ten million children in single-family homes, the vast majority of which are headed by single mothers.[21] Moreover, even the supposed similarities fade when evaluated in greater detail. Langston's single mother is combative and resilient, having at one time been so poor that they lived in a cardboard box, now surviving the "drugs, crime and everything else common to living in poverty" that "the hood had to offer." The film, on the other hand, features an upbeat urban housing community, where Kevin prepares for work by opening a closet full of at least seventy-five pairs of new shoes, and banters with his gregarious and nurturing grandmother.

- On walk to school the three friends discuss that they will be graduating soon from high school and talk about their future and Jalen mentions his disgust for Toy vs. On walk to work the three friends discuss that they just graduated from high school and talk about their future and Benny mentions his disgust for Lorenzo

These generalizations are not accurate reflections of the works. In the book, the three friends (Langston, Jalen and Tori) see each other before school. Tori leaves

---

20. In *Muller v. Twentieth Century Fox Film Corp.,* 794 F.Supp.2d 429, 443 (S.D.N.Y. 2011), the plaintiff's expert report included a list of *several hundred* alleged similarities between the two works with respect to plot, setting, sequence of events, characters and dialogue—but the report, as here, emphasizes scattered similarities, many of which are no more than common or stock themes.

21. The U.S. Department of Housing and Urban Development Office of Policy Development and Research notes that over thirty percent of households in public housing have children, and a majority of those families are single-parent households. Further, public housing serves African–American households at rates far outpacing their share of the renter population.

in a car, leaving Langston and Jalen to walk alone and talk about Langston's decision to "go pro," to which Jalen responds that he hopes Langston didn't "sign with the money-grubbing agent" (Toy). By contrast, the film begins with the three friends walking to work over the summer. They see neighborhood bully and ex-con Lorenzo sitting in the courtyard flexing his muscles. The boys try not to make eye contact with him, but when Lorenzo catches their eye, he calls the two boys over. There is certainly commonality in these story elements that set the stage for the three friends to begin their day and introduce readers (and viewers) to the future antagonist who will attempt to extract money from the main character. But to suggest that these scenes are lifted wholesale from the book and are exact copies of White's work is disingenuous.

- Protagonist gets a chance to design sneakers vs. Protagonist wants to design sneakers

Again, this alleged comparison is inaccurate. Langston, the protagonist in the book, is offered a $17 million shoe deal by "New Funk Apparel" in the wake of his decision to enter the professional basketball draft. A "shoe contract" is based on the company's likely interest in having Langston's image represent the brand once he is in the NBA—Langston does not discuss shoes nor does he design anything. Kevin, on the other hand, works at Foot Locker, owns an overwhelming number of sneakers, dreams of one day owning an extremely expensive and valuable pair on display at his store, and mentions plans to go to design school.

- Katrina walks up to Langston and squeezes his butt. She has on a tight fitting t-shirt that stops at the small of her back and jeans vs. Nikki walks up to Kevin and talks to him and squeezes his butt wearing the same outfit

In the abstract, these scenes appear extremely similar. But they represent little more than a cliché scene between flirtatious and promiscuous young adults. Katrina "looked behind us then squeezed [Langston's] butt" and then having been rebuffed by Langston, her on-again-off-again partner, she "snatched off her button-down sweater and let her matching, tight-fitting tee that stopped just above her tattoo along the small of her back shine for all to see." In somewhat similar fashion, having found out that Kevin has won the lottery, Nikki flirts with him in the courtyard, wearing tight jeans and a black midriff, and then seductively walks away. A young woman wearing tight jeans and a midriff is hardly copyrightable. No tattoo is visible in the movie, and the interaction between Kevin and Nikki is not based on any prior relationship.

- Girlfriend (Tori) doesn't like Katrina throughout the book vs. Girlfriend (Stacie) doesn't like Nikki and vice versa

Again, this characterization is not accurate. Stacie is not Kevin's girlfriend, unlike Tori and Langston's long-term relationship that leads to marriage. There is scant interaction between Stacie and Nikki in the film, yet Tori and Katrina have multiple exchanges throughout the book, at one point erupting into an public fistfight. More importantly, the idea of a love triangle with two females who might compete for one man is a theme as old as literature itself. The list of works depicting this plot line is endless, and this theme is anything but protectable.

- Jalen gets his leg and arm cut off by Toy and his henchmen vs. Kevin and Benny get into Sweet Tee's car and ask what might happen if one were unable to pay back money owed to

Sweet Tee, to which Sweet Tee says he'd saw off their legs at the knee caps

In the book, Jalen is brutally attacked, has his arm and leg cut off, spends time in the intensive care unit, and ultimately dies. His funeral is described in detail. Sweet Tee, on the other hand, jokes that he'd cut off someone's legs at the knee caps if someone did not repay money owed to him. Despite White's attempt to liken Jalen's gruesome mutilation and death to the sardonic dialogue in the film, there is simply no similarity between the episodes.

■ As the court noted in *Beal*, "lists are inherently subjective and unreliable, particularly where the list contains random similarities which could be found in very dissimilar works." 20 F.3d at 460 (citations omitted). This observation is apt here. No small number of the purported similarities that White points to between the works could be identified in numerous independent, and very dissimilar works.[22]

No average person could conceivably recognize the film as having been lifted wholesale from the book. Beyond broad commonalities of generalized themes and plot-lines, the works have scant similarities of detail. No reasonable fact-finder would conclude that the film is substantially similar to the copyrightable elements of the book.[23]

## B. Independent Creation

■ Where a plaintiff establishes both access and substantial similarity between the works, he raises "a presumption of copying which may be rebutted by the defendant with evidence of independent creation." *Original Appalachian Artworks, Inc.*, 684 F.2d at 829. Defendants therefore offer extensive evidence of Erik White's independent conception of the story for the film in 1997. His concept was based on his own childhood in public housing in Brooklyn, imagining someone in the projects winning the lottery and having to

22. Numerous works feature young, aspiring, African–American basketball prospects (*He Got Game; Love and Basketball; Above the Rim; Hoop Dreams*); the challenges of urban housing projects (*see supra*, n. 15); and adolescent love triangles (*The Hunger Games; The Twilight Saga; Romeo & Juliet; 90210*).

23. Courts have granted summary judgment based on a lack of substantial similarity in cases where the works in question present far more significant overlap than the works here. *See Berkic*, 761 F.2d at 1293 (insufficient similarity where "[b]oth deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants"); *Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir.1986) (book "Fort Apache" and film "Fort Apache: The Bronx," both about policemen in identically hostile environment of 41st Precinct are not substantially similar, despite both featuring the murder of black and white policemen with handguns at close range, cockfights, drunks, stripped cars, prostitutes, rats, third- or fourth-generation

Irish policemen and repeated foot chases of fleeing criminals); *Funky Films, Inc. v. Time Warner Entmn't Co.*, 462 F.3d 1072 (9th Cir. 2006) (screenplay and television series both about a small funeral home, run by a patriarch who passes away at outset and is then run by two brothers did not share substantial similarities); *Gable v. Nat'l Broad. Co.*, 727 F.Supp.2d 815 (C.D.Cal.2010) (no substantially similarity where main character in both works spends time in prison, wins lottery tickets, uses winnings to remedy past misdeeds, and both protagonists return a man's wallet); *Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429 (S.D.N.Y.2011) (both works are fast-paced, set in or near Antartica, involve an underground pyramid, hostile forces and archeological excavation settings, feature similar team experts, use identical terms like "heat bloom" to refer to heat signal but are not substantially similar); *Arden v. Columbia Pictures Indus., Inc.*, 908 F.Supp. 1248 (S.D.N.Y.1995) (insufficient similarities despite both works centering on bachelors in their thirties, trapped in a repeating day, pursuing love interests).

safeguard the ticket until they could ultimately cash it in. Erik White has testified to his development of the story idea in the late 1990s, then working with talent managers in California in 2003, and ultimately coordinating with screenwriter Abdul Williams in 2005 to develop the treatment and then screenplay for the film.

And though persuasive, having concluded that the two works lack substantial similarity, the Court need not address Defendants' otherwise compelling evidence that Erik White independently conceived of the plot, theme and basic characters for the film years before Franklin White wrote and distributed his book.

### III. Testimony of Ellen Baskin

In their motion for summary judgment, Defendants reference findings by "researcher" Ellen Baskin, whose declaration accompanies the motion. Baskin was retained by Defendants to review the two works, to evaluate Plaintiff's expert report and to conduct research on similar films and works in the industry. White argues that Defendants have attempted to disguise Baskin's expert testimony as mere lay opinion and failed to disclose Baskin as an expert as required by federal and local rules. Defendants respond that they did not retain or designate Baskin as an expert and have never sought to qualify her as one.

 Baskin is a freelance researcher and writer. Her declaration is based upon her review of the two works and Internet research using Google, IMdB, YouTube and presumably other entertainment websites. Her declaration recites no qualifications, does not purport to be based on anything other than personal knowledge and presents a summary of popular and real life stories that share themes, plots and narratives with the works in question. While Baskin's declaration does address Plaintiff's expert report by name (the "Arnold Report") and evaluates a number of the major "points of correspondence" from that report, the Court is not persuaded that the declaration is intended "solely to contradict or rebut evidence on the same subject matter identified by [the other] party." *See* FED.R.CIV.P. 26(a)(2) (disclosure of expert testimony required where the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)). Directly contradicting Arnold's report would be achieved by challenging the similarities and correspondence between the two works, that is, arguing divergence where Arnold argued similarity. Instead, Baskin's declaration fully admits that a large sampling of Arnold's purported "points of correspondence" are in fact quite similar. Baskin's research is not concerned with dispelling the similarities between the two works or contradicting Arnold's conclusions; it is instead focused on identifying the countless motion pictures, television shows, and real-life stories that depict themes common to both works. Baskin sets out to establish that the alleged similarities and overlapping elements are no more than common, generalized themes and *scène à faire.*[24]

---

24. Baskin identifies motion pictures that feature the common theme of high school basketball stand-outs, treated like superstars by locals, pursued by women and struggling with financial and family issues, as well as multiple dramatic films about African American youth trying to escape the circumstances in urban housing projects. She then lists well-known movies, books and television series depicting the universal coming-of-age theme, particularly those works where the adolescent is being raised by a single parent, helping the parental figure financially, and other common themes explored between friends and love interests. Finally, she offers a laundry list of basketball players who have signed major en-

Baskin's online research hardly amounts to scientific, technical or specialized knowledge, and her comparisons could have been easily researched and stated by Defendants' counsel. Defendants admit as much in acknowledging that they engaged Baskin because her hourly rate is significantly lower than the cost of an associate. For example, Baskin's declaration includes the opinion that stories about characters about to graduate or recently graduating high school and transitioning to adulthood constitute "an entire genre known as the coming-of-age story." White contends that "this 'genre' and its title is beyond the knowledge of a layperson." The Court disagrees. The coming-of-age narrative is a remarkably common topic in literature and film. Tropes about teenagers, adolescents, and young adults navigating the transition to puberty and adulthood are universal. Recognition of this genre is hardly reserved to literary or film experts.

Arguing for exclusion of Baskin's lay research, White also contends that only an expert would be able to generate a list of films concerning graduation, basketball documentaries, facts about athletes donating to charitable causes or professional athletes with shoe endorsement deals. Perhaps White is not familiar with the reach of Google or IMDb. The most cursory and elementary Google-search returns results mirroring Baskin's. Using search-terms like "professional athlete shoe deal" or "movies about basketball" or "athlete donates to charity," one can produce hundreds of results. Baskin's research is anything but expert.

However, Baskin is an accomplished professional writer and researcher, and some of her findings reflect fairly extensive industry knowledge. Having worked with Baskin in the past, Defendants retained her in January 2014, months before the filing of their motion for summary judgment. Even absent qualification as an expert, Baskin was clearly privy to the dispute between the parties and was retained to evaluate Arnold's report and to compare common themes in the works. Despite this, Defendants failed to disclose her identity and declined to supplement earlier responses to interrogatories.[25] Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to produce information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion ... unless the failure was substantially justified or is harmless."

In an attempt to explain their omission, Defendants argue that they did not retain Baskin in this case until the close of discovery and chose to have her conduct research only because her hourly rate was more affordable than an associate attorney's. Defendants admit that an attorney's declaration could have reviewed and authenticated the films, television shows, Internet sites and research conducted by Baskin. But they chose instead to have Baskin draft an eleven-page declaration that they submitted with their motion for summary judgment more than three months later. Defendants submit that they offered to allow White to depose Baskin after both parties had filed motions for summary judgment. But this does not cure their failure to comply with the rules. *See Fields v. Atlanta Indep. Sch. Sys.,* 916 F.Supp.2d 1348, 1352 (N.D.Ga.2013) (ex-

---

dorsement contracts and provides examples of players "giving back" to their communities.

**25.** Plaintiff's discovery requests and interrogatories [79–6] required Defendants to identify all persons with knowledge of the facts or circumstances of the case and to supplement their responses where appropriate.

cluding affidavit of fact witness where defendants failed to disclose the witness in their initial disclosures, in supplemental disclosures, or at any point during discovery, noting that defendant's failure could not be cured following close of discovery). Accordingly, the Court sustains White's objections with respect to Baskin's declaration, [86–2], and this evidence has not been considered by the Court.

## IV. Conclusion

Defendant's motion for summary judgment [65] is GRANTED. The Court will grant Plaintiff's motion to exclude Baskin's testimony [86]. The Clerk is DIRECTED to close the case.